### M. M. Thompson, Executor, *v.* W. C. Mylne et al.

Where a partnership sells an interest in a plantation to a third person on credit, it being stipulated the share of the third person in the profits shall be applied to the payment of the price of his purchase, the transaction will be regarded not as creating a joint ownership merely in the plantation, but as a sale upon condition that the third person's interest shall be applied to the payment of his debt; and other creditors cannot subject that third person's interest to the payment of debts due to them, until the price of the purchase is first paid.

APPEAL from the Fifth District Court of New Orleans, *Buchanan,* J. *John R. Grymes* and *E. Briggs,* for appellants. *Simon* and *Morphy, Prentiss* and *Finney,* and *R. Hunt* and *J. Seghers,* for appellees. The judgment of the court was pronounced by

PRESTON, J. On the 16th of March, 1828, *Messrs. Dennistoun & Co.* and *G. B. Milligan,* entered into the following agreement: "Agreement betwixt *Messrs. Dennistoun & Co.* on the one part, and *G. B. Milligan* on the other part: 1. *Dennistoun & Co.* agree to sell to *G. B. Milligan* one-third of a sugar plantation they own, situated near the English Turn, on the other side of the river, with all the slaves, buildings, utensils, &c., thereon, or appertaining thereto, for fifty-two thousand dollars, payable in one, two, three, four, five, six and seven years, in equal installments, without any interest until the end of the contract; and on whatever sum may be then unpaid, *G. B. Milligan* to pay six per cent interest per annum, with special mortgage of the property until the whole is paid. 2. It is understood that ten slaves and six manumitted negroes, owned by *G. B. Milligan,* are to remain on the estate to assist in its cultivation, and be fed and clothed as the other negroes on the plantation, at the general expense. 3. It is understood that *G. B. Milligan* will reside upon the plantation, and devote his attention wholly and exclusively to its cultivation and improvement; that he shall receive from the concern an annual salary of one thousand dollars, and have the privilege of what the plantation may yield, for his own use; but his expenses, otherwise, to be borne by himself. 4. The supplies, requisite for the plantation to be furnished by *Dennistoun & Co.,* and a commission thereon of two and a half per cent, as well as on all sums they may lay out, to be charged; the crop of sugar to be sold by them, charging a commission of two and a half per cent, as well as on the proceeds of any wood, stock or other produce that may be sold; an annual statement to be made out, and the proceeds of the sales, after deducting the current expenses, to be considered the annual product of the plantation, one-third of which to be placed to the credit of *G. B. Milligan* and the remaining two-thirds to the credit of *Dennistoun & Co.* 5. That this contract shall exist for seven years, and at the end of which period, if agreeable to all parties, be renewed; but if a dissolution should take place, the value of the property to be fixed for settlement by mutual appraisement, or by public sale. 6. In case the proposed sugar house and other buildings are erected, and additional negroes purchased, *G. B. Milligan* to pay one-third of whatever sums may be laid out, bearing interest at six per cent per annum, from the date of the money being advanced by *Dennistoun & Co.* until his share is paid. 7. This agreement will be regularly completed by

a notary public as soon as possible.  Signed in duplicate.  New Orleans, this sixteenth day of March, 1828.  (Signed,)  DENNISTOUN & Co.  G. B. MILLIGAN."

The partnership thus formed was carried on to the entire satisfaction of all parties until the death of *G. B. Milligan*, in March, 1841.  He was so well satisfied with the arrangement and conduct of the partnership, that he appointed *M. M. Thompson*, a partner in the firm of *Dennistoun & Co.*, his testamentary executor.  The accounts of the partnership were kept by the firm of *Dennistoun & Co.*, who, by the terms of the contract were to be the factors of the plantation, furnishing its supplies and disposing of its crops.  They made up and rendered annual accounts of the partnership, and credited *Milligan* with one-third of the net proceeds of the crops, which with his annual salary, after deducting his private account, was appropriated to the payment of his interest in the plantation and slaves.  They continued to keep and render similar accounts to *Thompson*, the executor of *Milligan*, until 1844.  He had made an inventory of the estate of *Milligan* in the parish of Plaquemines, where the plantation was situated, and in March, 1844, rendered an account of his administration.  The widow and heirs of *David Urquhart*, who was a large creditor of *Milligan*, opposed the account.  This induced the executor to bring a suit in New Orleans for a partition of the plantation and slaves, and settlement of the partnership.  The widow and heirs of *David Urquhart* intervened.  *George B. Milligan* has also been appointed dative executor of his father, *George B. Milligan*, and has become a party to the suit.  And after much litigation in the Fifth District Court, in the late Supreme Court, also in this court, the case has been submitted to us almost exclusively on questions of law.

It is ascertained that when *Milligan* died, on the 16th of March, 1841, he was indebted to the firm of *Dennistoun & Co.* in the sum of $31,834 65, growing out of their transactions with regard to the plantation and slaves.  At the same time, he owed the late *David Urquhart* $93,419 30.  The plantation and slaves have been sold to effect a partition of the same, and settlement of the partnership.  And since the death of *Milligan* there has been realized from the third of the crops belonging to his succession, and from the sale of his third interest in the plantation and slaves, and also from the hire of some slaves belonging separately to his succession, a sum of near sixty thousand dollars.

The firm of *Dennistoun & Co.* insist, that this money should be applied to the extinguishment of the indebtedness of the succession to them.  The heirs of *David Urquhart* contend, that it should be appropriated proportionably to the payment of the indebtedness to them and to *Dennistoun & Co.*  And the dative executor, *George B. Milligan*, claims that it should be handed over to him to make the distribution, there being no other creditors of the testator.

The decision of the controversy depends upon the application of our laws to the agreement between *Dennistoun & Co.* and *George B. Milligan* in 1828, and the effect of that agreement under those laws.

It is contended by the dative executor and the heirs of *Urquhart*, that *Dennistoun & Co.*, by the agreement, sold to *G. B. Milligan* the third of the plantation and slaves on terms, that for the payment of the price they are his creditors, but have no special mortgage, because none was given or recorded; and have no legal privileges over *Urquhart's* heirs on the proceeds of the crops, and plantation and slaves, because the code gives them none.  They contend further, that *Dennistoun & Co.* are not creditors of the partnership, and are not, therefore, entitled, under article 2794 of the Civil Code, to be paid out of the

partnership funds in preference to the creditors of the individual partner. In these positions they are correct, and the surviving partners must support their claim without reference to the articles of our code, giving special mortgages or privileges and a preference to the creditors of the partnership over the creditors of an individual partner upon the partnership funds. Those articles do not apply directly to the case before us, although the equitable principles upon which they are founded indicate that the same equity should govern the present case, which is so similar to those to which they apply.

To decide this controversy justly, it is necessary to examine carefully the contract of the parties, to ascertain their objects, and to give effect to their whole intentions, if not prohibited by our laws. They made an agreement, embracing several species of contracts. Its leading object was to form a partnership for the cultivation of a sugar plantation in the parish of Plaquemines. For that purpose : 1. *Dennistoun & Co.*, who owned the plantation and slaves, agreed to sell to *G. B. Milligan* one-third of the same, with all the appurtenances, for $52,000, payable in one, two, three, four, five, six and seven years, without interest. 2. The parties agreed that *Dennistoun & Co.* should have the factorage of the partnership for two and a half per cent commissions for all supplies furnished, and a like commission on the sale of all the products of the plantation. 3. That *Milligan* should have employment as superintendent of the plantation, with a salary of $1000 per annum, and some perquisites. 4. The profits of the partnership were to be shared in proportion to the interest of the partners in the concern. The share of *Dennistoun & Co.* was to be credited to them, and the share of *Milligan* was to be credited to him. 5. The partnership, at its dissolution, was to be settled by a valuation of the property, or by a public sale. 6. The partnership was to continue seven years, to be renewed if agreeable to the parties ; and was, in fact, continued until dissolved by the death of *Milligan*, in 1841.

It is our duty to carry the whole of this agreement and all its objects into full effect, and to allow the parties the benefit of every part of it, unless absolutely prevented by some positive provision of law. And to do so, it will be proper : 1st. To consider the terms of the agreement. 2d. To ascertain, if possible, the intentions of the parties. 3d. To derive what light we can from the analogies of the law ; and lastly, and above all, to consider what is equitable between the parties. In perusing the contract, it cannot be doubted that there was a sale by *Dennistoun & Co.* to *Milligan* of the third of the plantation and slaves; but there is as little doubt that it was sold for a purpose which constitutes the most essential part of the whole agreement, and without which it would never have been made,—that it should form *Milligan's* stock in the partnership. The sale was made entirely upon credit; and to reduce the debt, *Milligan* was to be credited annually with one-third of the net profits of the plantation. Substantially, then, one partner furnished the whole capital of the partnership, and the sale was only a mode of ascertaining the present share and final interest of the other partner.

There is a clause in the agreement which must bear this construction, and therefore supports a like construction of the whole contract. It was agreed that, " in case the proposed sugar house and other buildings are erected, and additional negroes purchased, *G. B. Milligan* is to pay one-third of whatever sums may be laid out, bearing interest at six per cent per annum, from the date of the money being advanced by *Dennistoun & Co.* until his share is paid." This clause and the terms of the whole contract satisfy us that it was an agree-

ment by one partner to advance the whole capital of the partnership; and the debt by *Milligan* to *Dennistoun & Co.*, for his share, was contracted in consideration that they furnished the whole capital of the partnership. It grew out of the partnership, and without the formation of the partnership the sale would not have been made, nor the debt have been contracted. *Dennistoun & Co.* became creditors, not only of *Milligan*, but of his interest in the partnership to the amount of the price of his share.

For this reason, the intervenors erroneously treat the plantation and slaves as property only subject to a joint ownership, the same as if acquired by the joint owners respectively from different vendors, and with regard to which there are no social relations. For it is to be considered that the joint ownership in this case was created for the purpose of being subsidiary to a partnership, and that it is to be subject to, and governed by, the terms of the contract of partnership for which it was created. The joint ownership in this case is the capital stock of the partnership, created by the articles of co-partnership, and must be disposed of so as to settle fully the rights of all the parties. For this settlement there was an express provision in the contract, that on the dissolution of the partnership, the value of the property, that is, of the whole plantation and slaves, should be fixed for a settlement by mutual appraisement or by a public sale. The settlement thus contemplated and provided for must have been a settlement of the claims of the partners upon the partnership property, and claims upon each other respectively, growing out of the partnership, and then a division of the surplus. The appraisement or sale of the whole property was for the purpose of making these settlements, and to ascertain the interest of *Dennistoun & Co.* in the *residuum* after these settlements, and the like interest of *Milligan* in the *residuum*. And it was even provided in another clause in the agreement, that if, at the termination of the agreement, any sum whatever should then remain unpaid by *Milligan*, he should give a special mortgage on the property to secure its payment, with six per cent interest until it was paid.

A reasonable interpretation of these clauses of the contract leads to the conclusion, that *Dennistoun & Co.* were to receive the whole price of the share in the partnership sold to *Milligan*, before the latter was entitled to draw any part of the capital stock or its proceeds; and that there was to be a full settlement of the debt created for the formation of the partnership, as well as of the partnership itself, to ascertain the residuary interest of *Milligan*, before any division of the capital stock could be made.

The agreement before us was indeed an agreement to sell; but it was an agreement to sell for the sole purpose of forming a partnership, and upon the condition that the vendors should be paid by the vendee, out of his third of the plantation and slaves, the whole price, before the vendee should draw anything out of the capital of the partnership formed by the sale. Now, conceding that an agreement to sell amounts to a sale, yet an agreement to sell for a certain purpose, and upon conditions, amounts to a sale for that purpose and upon those conditions; and the property sold remains subject to the purpose and conditions, which must be carried into full effect before the sale becomes unconditional.

Our code has not defined the various conditions which may be appended to the contract of sale. Justinian attempled it in the title of his code, *De pactes inter empt. et vendit;* and his failure warned his successors of the futility of the attempt. They have no other limit than the will of the parties, and the paramount obligation on their part to enter into no contract against good morals and public policy. For the purpose of giving to the contract of sale the faculty

of adapting itself to all objects and modifications not incompatible with general principles, our code simply provides in general terms, that it may be made purely and simply, or under a condition either express or implied, and that in all cases its effects are regulated by the principles laid down in the title of Conventional Obligations, 2432. The article 2021 in the title of Conventional Obligations provides, that conditions in obligations are either express or implied. They are express, when they appear in the contract. They are implied, when they result from the operation of law, the nature of the contract, or from the presumed intent of the parties. No case was ever presented to a court of justice in which the condition of the contract more clearly resulted from its nature and the intent of the parties than in the present. The whole agreement was a contract to sell, with an express condition that a partnership should be formed between the vendor and vendee, and that the thing sold should be the vendee's capital in the partnership ; with a further condition, partly expressed and partly implied, that the vendee should not take his capital out of the partnership until the selling partner should be paid the price. And, as the entire contract was advantageous to the purchaser, the enforcement of it can give no just ground of complaint to his creditor.

There is a further difference between an agreement or promise to sell and a sale. An agreement to sell is an executory ; a sale, an executed contract. If the agreement to sell is not accompanied by delivery, the sale is not perfect until the delivery corporeally, or by a public act of real property. So, if the agreement to sell contains a clause that an authentic act shall be passed and a special mortgage given to secure the price, creditors of the vendee are informed that this act must be passed and a special mortgage given before the sale is perfect between the parties ; and that, by a fair interpretation of article 2437 of the code, they can acquire rights against the property only subject to this agreement. So, we have come to the conclusion, in examining the case of *Millaudon v. Sylvester*, to be noticed hereafter, that when the agreement to sell is made for the purpose of forming a partnership between the vendor and vendee, there is no delivery to the vendee individually, but to the partnership. And that the selling partner retains a joint possession of every part of the thing of which an undivided part is sold, of which he cannot be divested; nor creditors of the vendee acquire rights in the thing sold until the price is paid and the terms of the agreement fulfilled. We have no doubt the intentions of both parties, in making their agreement, conformed to this plain interpretation of their contract. If the proposition now made, that *Milligan* or his creditors might take any part of the capital stock sold to him on credit out of the partnership before it was paid for, had been distinctly proposed in making the contract, we know *Dennistoun & Co.* would not have accepted it, or made any sale, or entered into any partnership with *Milligan* upon such a condition. *Milligan*, too, understood the agreement as we have interpreted it. For *Dennistoun & Co.* rendered him annual accounts, crediting his indebtedness for an interest in the partnership with the net profits of his share, which accounts he accepted during his life ; thus compensating what is called his private debt to *Dennistoun & Co.* with his claims against the partnership, and showing his understanding that he was entitled to draw nothing from the partnership until that debt, whether a private or partnership debt, was extinguished. And we do not entertain a doubt that if he were now living he would unite in declaring that to have been the contract with his partners, and would so carry it into effect. And so well was he satisfied

with this mutual understanding, that he appointed one of his partners his testa-mentary executor; no doubt, faithfully to carry it out after his death. Neither his testamentary representative nor his creditors have a right to claim a different execution of the contract from that intended by *Milligan*, or to construe it in a manner which would work palpable and unqualified injustice to the other party to the contract.

We have not been able to derive much light from the decision of cases analogous to the present, nor from elementary writers on the law of partnership. Judge Story, in his work on Partnership, states as a general rule, "that no separate creditor of a partner can acquire any right, title, or interest in the part-nership stock, funds, or effects, by process or otherwise, merely in his character as such creditor, except for so much as belongs to that partner as his share or balance after all prior claims thereon are deducted and satisfied." The authority has some weight with us in this case; although the very question as propounded by the intervenors is, whether *Dennistoun & Co.* have priority over the claim of the widow and heirs of *Urquhart*. The authority, however, has weight, because we do not think that is the true question, as we will now explain, in considering the case of *Millaudon* v. *Sylvester*. The agreement of sale and partnership in that case was in every respect similar to that in the present case. *Millaudon* stood precisely in the relation of partner and creditor of *Sylvester*, in which *Dennistoun & Co.* stood to *Milligan*. He sued for a settlement of the partnership, and the court ordered the whole property to be sold, and *Millaudon* to be paid out of its proceeds his whole debt, as well what was due for the sale to *Sylvester* of his interest in the partnership, as for his claims strictly against the partnership. *Sylvester* was not allowed to take his share of capital out of the partnership until *Millaudon* was paid for it. There was no creditor, it is true, conflicting with *Millaudon*, as the *Urquharts* conflict with *Dennistoun & Co.* in the present case. Can that make any difference? Certainly not; unless the creditor of a partner can draw out of the partnership what the partner him-self cannot. But the creditor of the partner can have no greater rights against the partnership than the partner has. No one can transfer greater rights to a thing than he owns himself. A creditor can acquire the whole interest of his debtor in a thing, but not a greater interest.

The true question, therefore, in the present case is, what interest *Milligan* had in the partnership. And if he had only a residuary interest after the pay-ment of all he owed to his partners, the authority of Story, and the proceedings, rather than the decision, in the case of *Millaudon* v. *Sylvester*, have a bearing upon the present case favorable to *Dennistoun & Co.* The report of the case of *Skip* v. *Harwood* is somewhat obscure; but we gather from it that Lord Hardwicke also adopted in its decision the principles invoked by *Dennistoun & Co.* in the present case. Our own code authorizes the solvent partners to require that the partnership debts should be paid out of the partnership funds, and until the partnership creditors are paid, neither the insolvent partner nor his creditors are allowed to draw anything. There seems to be the same reason for allowing a partner who has advanced the capital of another, and who is indebted to him for it, to draw that indebtedness out of the partnership funds before the debtor partner or his creditors can draw anything.

It has always been held by our courts that a partner cannot sue for any par-ticular part of the partnership property; but that, at its dissolution, there must be a general settlement, in which every partner is entitled to his just claims, not only on the partnership property, but for all obligations contracted, *inter se*, as part-

ners. As the partner is subject to this settlement, his creditors can claim nothing more than he could or would receive on this settlement. In fact, the creditor can only seize the partner's interest in the partnership. He cannot seize any particular thing belonging to the partnership, or acquire any rights upon it. Now, the interest of a partner is what belongs to him after a full settlement with his partners, according to the terms, spirit and intention of the contract of partnership, and of all agreements incidental to it. Bearing this in mind, it is easy to answer the arguments of the intervenors in this case.

It is urged that *Dennistoun & Co.* are not creditors of the partnership, but of their deceased partner. Be it so, but they are creditors of their deceased partner with an agreement that, in settling the partnership, their debt should be satisfied out of the property they sold him to form the partnership. This part of the contract is as binding as the sale itself. Changing the proposition, it is said *Milligan* owed his partners and not the partnership. If so, he owed them for the advance of his share in the capital to form the partnership, and which advance must be paid before he or his creditors can take anything out of the capital. It is said, that if a third person had sold to *Milligan* the property which he put into the partnership, the vendor could not have claimed payment out of the partnership funds, nor out of *Milligan's* interest, in preference to other individual creditors of *Milligan*. That is true, and for the obvious reason, that there would have existed between him and his vendor nothing but the relation of vendor and vendee, and a transaction to be governed exclusively by the laws applicable to sales and the rights of creditors. But an agreement to sell, only as an auxiliary to the higher object of forming a partnership, subjects the property to the terms of the partnership and the intention of the partners, as evidenced by the double contract of sale and partnership.

Upon a full consideration of the whole agreement before us, no other fair and equitable interpretation can be given to it, than that the parties formed a partnership in planting; that *Dennistoun & Co.* conveyed by way of sale to *G. B. Milligan* a third interest in the plantation and slaves for that purpose, for the sum of $52,000, payable on terms, and to be his portion of the capital; but with a perfect understanding between the parties, that no part of his third interest should be withdrawn from the capital until full payment of the price; and in case of dissolution of the partnership, and settlement by sale of the partnership property, that *Dennistoun & Co.* should be paid out of its proceeds the debt due for *Milligan's* portion, before he, his creditors or representatives should receive any part of the partnership capital. We see nothing in this agreement in conflict with the provisions of our laws relative to partnership, or upon any other subject. We see nothing in the agreement which ought not and cannot be enforced without injury to the equitable rights of others. And if, from the paucity of our legislation on the subject of partnership, it be true that no provision of law expressly applies to the case, it is one to which the court is bound to apply that general provision of equity contained in the 21st article of our code. " In civil matters, where there is no express law, the judge is bound to proceed and decide according to equity, by appealing to natural law and reason." It would indeed be a reproach to our jurisprudence if *Dennistoun & Co.* should not be permitted to take out of this partnership, to which they owe nothing, the very capital which they put in, and for which they have not been paid, and that the creditors or representatives of *Milligan*, who was a debtor to the partnership, and to his partners for his share in the partnership, should be permitted to take out capital for which he never paid. There has been no suggestion that the

surviving partners did not manage the plantation and slaves until sold advantageously for the succession of *Milligan.*

THOMPSON
*v.*
MYLNE.

It is therefore decreed, that the judgment of the district court be reversed; and it is adjudged and decreed, that *Dennistoun & Co.* be allowed to retain out of the net proceeds of the third of the crops and produce belonging to *G. B. Milligan's* succession, and out of the proceeds of the third of the plantation and slaves belonging to him, the sum of thirty-one thousand eight hundred and thirty-four dollars and sixty-five cents, with six per cent interest from the 16th of March, 1841, ; the accounts to be made up annually, as was done during his life ; the costs of the district court to be paid, two-thirds by *Dennistoun & Co.*, and one-third by the succession; and the costs of this court by the appellees.